CHARLES E. JACKSON and ABRAM VANDERBILT, Respondents, *v.* THE BUILDERS' WOOD WORKING COMPANY, Appellant.

*Sale — memorandum — parol evidence, when admissible — writing construed against the one who drew it — understanding of a witness as to the meaning of a contract — inadmissible when it is the result of conversations not had with or in the presence of the other party to the contract.*

Where the written memorandum of a contract of sale is clear and explicit in its terms, parol evidence is not admissible to vary or contradict it.

Where, however, it represents only a part of the contract, parol evidence is admissible to establish the whole contract, the purpose being not to contradict the contract, but to explain it.

Where a written instrument is susceptible of two constructions that construction should be adopted which bears most strongly against the person who drew the instrument.

Upon the trial of an action brought to recover the difference between the full inventory price paid by the plaintiffs for certain moldings and the inventory price of the quantity thereof delivered, it appeared that the moldings had been purchased under a bill of sale which contained the following provision : " Lot of moldings, being all those in both molding rooms at our manufactory described in our inventory of Octo. 2, 1892, as of to-day, F. O. B. cars Brooklyn, $2,018.00."

There was a dispute as to the meaning of the words " as of to-day," and three witnesses for the vendees, who had been present when the written contract was entered into, and through whose efforts the sale had been effected, were permitted to testify as to their understanding of the expression; but, although the transactions attending the execution of the bill of sale took place at the defendant's factory, there was no proof that the defendant's treasurer (who took part in the negotiations and who signed the agreement on behalf of the defendant) heard or assented to the conversations in which such understanding was reached.

*Held,* that the admission of such evidence was erroneous and justified a reversal of the judgment in favor of the plaintiffs.

APPEAL by the defendant, The Builders' Wood Working Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 4th day of May, 1895, upon the report of a referee.

*Frank H. Field,* for the appellant.

*Wallace Macfarlane* and *Max J. Kohler,* for the respondents.

O'BRIEN, J. :

The defendant was indebted to one Stone, representing himself and the firm of E. B. James & Co., in the sum of $2,102.65. With knowledge that some of the defendant's notes had gone to protest and in anticipation of the failure of defendant, Stone and Harris, one of the firm of E. B. James & Co., came on from Boston, and together with the plaintiff Jackson, a lumber dealer, went on November 12, 1892, to the defendant's factory in Brooklyn, where they remained during the day, endeavoring to arrange a settlement by a sale to Jackson of a sufficient amount of moldings to cover the indebtedness to Stone and E. B. James & Co., of $2,102.65. After negotiations had lasted through most of the day, an agreement was reached by the parties, a memorandum of which in writing was drawn by Harris, reading as follows :

"BROOKLYN, N. Y., *Nov. 11th*, 1892.
"C. E. JACKSON & Co., Patterson, N. J.
To BUILDERS' WOOD WORKING Co., Dr.

"Lot of moldings, being all those in both molding rooms at our manufactory described in our inventory of Octo. 2, 1892, as of to-day, F. O. B. cars Brooklyn, $2,018.00."

Upon this bill the defendant wrote the following :

"Messrs. C. E. JACKSON & Co. :

"Please pay the amount of the above to F. C. Stone.
"BUILDERS' WOOD WKG. CO.,
"JAS. R. PERINE, *Treas.*"

And Jackson thereupon wrote the following acceptance :

"We hereby accept the above order.
"11—12—92.  CHAS. E. JACKSON & CO."

Stone then surrendered to the defendant its obligations, and on or about the 14th day of November, 1892, and before delivery of any of the moldings, plaintiffs paid to Stone, as requested by defendant, the sum of $2,018. Thereafter and between November 15 and December 29, 1892, the defendant shipped and the plaintiffs received four carloads of moldings. While not admitting nor disputing the fact that all the goods in both molding rooms were

included in the delivery, the plaintiffs, after measuring the moldings delivered and finding that they amounted to less than two-thirds of the quantity and value stated in the inventory, made a demand upon the defendant to supply the short shipments or to pay back the difference between the full inventory price paid by them and the inventory price of the quantity delivered. This balance, amounting to $829.11, was the amount sued for and for which a recovery was awarded by the referee.

It will thus be seen that the plaintiffs contend that the moldings were sold according to the inventory, and that the agreement was that they should receive the full inventory quantity ; while the defendant contends that the sale was in bulk of such moldings as then were in the molding rooms, without reference to the inventory, and that the memorandum drawn by Harris expressed the contract. In determining which contention is right resort must be had to the written memorandum, and if clear and explicit in terms, then, under well-settled principles of law, parol evidence would not be admissible to vary or contradict it.

The ambiguity in the written memorandum, if any, is created by the use of the words " as of to-day," which, the defendant claims, means " as found in the molding rooms to-day," and which, the plaintiffs claim, means that the inventory should be made good as of to-day. In other words, the plaintiffs claim that the phrase " as of to-day," instead of meaning the moldings described in the inventory as they exist to-day, was intended to be a warranty that if there was not as much now as described in the inventory the defendant would make the difference good. As between these contentions and irrespective of any contemporaneous parol evidence, we should be inclined to adopt the defendant's version, because, taking the form of the memorandum, if it was intended to be a sale of moldings, not in bulk but according to an inventory, which so far as it was lacking in quantity was to be made good, then the language used was most inapt and ill chosen. This view is strengthened when we recall the rule applicable to the construction of a writing, which requires that as between two constructions, other things being equal, that should be adopted most unfavorable to the one who formulated it, or, as it is expressed, most strongly *contra proferentum, i. e.,* against the author of it. Here it is conceded that it was written by

Harris, who, with Jackson and Stone, made up the party that was endeavoring to obtain from the defendant some benefit.

Assuming, however, as the referee did, that the writing in question was only part of the contract, and that parol evidence was admissible to establish the whole contract, the written portion not being contradicted, but only explained, then we must examine such evidence as bears upon the subject-matter, the relation of the parties, their acts and declarations, to enable the court to put itself in the place of the contracting parties, and to determine what was the meaning of the language used and what was the contract between them. The testimony shows that the subject-matter of the contract was the sale of a lot of moldings to Jackson with a view to satisfying the claim held by Stone, which the latter was anxious to have adjusted, anticipating the insolvency of the defendant. The plaintiff Jackson went with Stone and Harris to the factory of the defendant in Brooklyn, on the day stated ; there they examined a large quantity of these moldings which were in the molding rooms in the factory, and were shown defendant's inventory of the moldings. It appeared that this inventory had been made about October second, nearly six weeks before the purchase. Jackson noticing this, asked the defendant's treasurer, Perine, about the quantity of moldings that was still in the rooms as compared with the inventory, and also at what price they were inventoried. Perine replied that while they had sold some moldings since the inventory was made, the additions from new stock manufactured by the defendant would, in his opinion, offset the sales, and that the quantity then in the molding rooms was fully equal to that stated in the inventory, and his foreman, when questioned on the subject at Perine's instance, made the same statement. Then the question was presented, what would result if the quantity delivered fell short or was in excess of that stated in the inventory. Jackson's testimony was that Perine agreed that if it fell short the shortage was to be made good, and that for any excess the plaintiffs were to pay. This statement as to shortage and excess was flatly contradicted by Perine, who testified that the only proposition that he entertained and the only contract that he made was for a sale in bulk. That there was a discussion about what was to result in the event of a shortage or excess, between Jackson, Stone and Harris, while engaged in examining the moldings in the rooms, or while in the

outside office, is evident.  But it is by no means so clear that any
of this conversation was in the presence of the defendant's agents,
other than what has already been referred to relative to a statement
by Perine that since the making of the inventory some moldings
had been sold, and that in his opinion the new moldings manufac-
tured and placed in the rooms would replace what had been sold and
removed.

If we construe so much of the contract as is written in the light
of some of the surrounding circumstances and some of the
acts of the parties, it militates against the view that this was a sale
according to a guaranteed inventory.  Thus we have the fact that
the insolvency of the defendant was anticipated, it being prob-
lematical in such an event, if the sale had been made by inventory
and a shortage resulted, whether the defendant would have been able
to make it good.  In addition we have the further fact that after
the agreement, whatever it was, between the parties, Stone imme-
diately surrendered to the defendant its obligations, and thereafter,
and before the delivery of any of the moldings, the plaintiffs paid
to Stone the amount of the agreed price.  As against the force and
weight to be attached to these circumstances, supported by the evi-
dence of the defendant's treasurer and the man in charge of the
molding rooms, we have the positive statements of Stone, Harris
and Jackson, that the contract between the parties was a sale, by
the terms of which the plaintiffs were to receive the full inventory
quantity.  Their testimony had a controlling influence on the mind
of the referee, and if incompetent as against the defendant it cannot
be regarded as harmless.

This brings us to a consideration of the objection made by the
defendant which we regard as fatal to this judgment.  Under
objection and exception these three witnesses were allowed to tes-
tify as to their understanding of the words " as of to-day."  It is
not claimed that the conversations in which such understanding was
reached were joined in by the defendant's treasurer, though an
attempt was made to show that the latter was sitting at his desk in
an inside office and could have heard the conversation.  These three
witnesses were in constant communication during the whole day,
examining the moldings, discussing between themselves the kind
of memorandum that should be drawn, and there was no duty on

the part of the defendant's treasurer to obtrude himself into or listen to such conversations when not addressed to him; and it would be going very far to hold, because they were thus engaged in conversation during the greater portion of a day, that the defendant is bound because its treasurer was sitting at a desk in a position where, if he desired, he might possibly have heard the conversations. We think that the admission of evidence of such conversations, in the absence of any proof that the defendant took part in, heard or assented to them, was error and entitles the defendant to a new trial.

The judgment, therefore, should be reversed and a new trial ordered, with costs to appellant to abide the event.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment reversed, new trial ordered, with costs to appellant to abide event.